31 C.C.P.A.(Patents)

## In re HODNETTE.

### Patent Appeal No. 4915.

Court of Customs and Patent Appeals.
June 26, 1944.

Rehearing Denied Oct. 2, 1944.

Otto H. Eschholz, of East Pittsburgh, Pa. (Ezra W. Savage, Franklin E. Hardy, and Jo. Baily Brown, all of Pittsburgh, Pa., of counsel), for appellant.

W. W. Cochran, of Washington, D. C. (R. F. Whitehead, of Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, and JACKSON, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Primary Examiner rejecting claims 21 to 25, inclusive, in appellant's application for a patent for an alleged invention relating to an induction apparatus, comprising a conducting coil and an interfitting magnetic coil, and a process for making the same.

Claims 21 and 22 define a magnetic core. Claim 23 defines, in combination, the core defined in claims 21 and 22 and a conducting coil. Claims 24 and 25 are method claims. Claim 25 defines the method of making the magnetic core defined in claim 21, while claim 24 adds to claim 25 the step of assembling the core about the coil.

Claims 21 and 24 are sufficiently illustrative of the appealed claims. They read:

"21. A core for induction apparatus having a conducting coil and a cooperating interlinked core, said core comprising a continuous ribbon of magnetic sheet material having preferred grain orientation in the direction of the length of the ribbon,

wound continuously flatwise upon itself in substantially rectangular loop form in a plurality of overlying successive layers to provide a coil-receiving window therein, and an adherent bonding material filling the spaces between the successive layers and holding the layers against relative movement, said core being severed transversely at two places, the sections having smooth-worked ends, whereby to permit the sections to be assembled around and to enclose a coil within said window with the smooth-worked ends of the core sections in abutting relative positions substantially as before severing."

"24. The method of manufacturing an induction device comprising a looped magnetic core and an enclosed coil of conducting material, comprising winding upon itself in successive layers a ribbon of thin flat magnetic material having preferred orientation of the grains in the direction of the length of the strip and consequent highest permeability in that direction, to form a closed loop having a window adapted to receive and closely surround the co-operating coil of conducting material, annealing the core, bonding the adjacent layers of said annealed core together throughout with an intermediate insulating adherent material adapted to hold them in relative position, severing the bonded core transversely at two or more places, mechanically smooth-working the cut ends, reassembling the core sections in original relative end-abutting positions to enclose the coil of conducting material in the core window, and clamping them in that position about the coil."

The references are:

Johnson et al. (Br.), 7,856, Of 1889.
Loring et al., 639,590, December 19, 1899.
Fessenden, 654,390, July 24, 1900.
Bliss, 1,174,225, March 7, 1916.
Ames, 1,497,469, June 10, 1924.
Elmen, 1,586,889, June 1, 1926.
Zamboni, 1,750,149, March 11, 1930.
British Patent, 314,084, May 8, 1930.
British Patent, 365,160, January 14, 1932.
Granfield, 1,992,822, February 26, 1935.
Franz, 2,252,461, August 12, 1941.

The record contains another Granfield patent (No. 2,160,588, issued May 30, 1939) and a Ledwinka patent (No. 1,512,032, issued October 21, 1924) which are not cited as references.

Appellant's alleged invention is sufficiently defined by the quoted claims, so that it is not necessary to further explain his structures or the method of making them.

In his decision, the Primary Examiner described somewhat in detail all of the references, and stated that each of the appealed claims was rejected as "unpatentable over any of Johnson, Granfield, Franz, Fessenden, or Elmen," and that the citation of several of the references seemed unnecessary.

The examiner held that claim 23 was additionally rejected as defining an old combination of core and coil, as disclosed in the patents to Johnson, Fessenden, and other references; that the combination was conventional; that no novelty of cooperation was either alleged or shown; and that if any improvement over the prior art was involved it was because of the magnetic core which, as hereinbefore noted, he held to be unpatentable over the references of record.

With reference to the Johnson, Granfield (No. 1,992,822), and Franz patents, the examiner said:

"All of these three references show cores similar to what applicant claims. Johnson's Fig. 4, Granfield's Fig. 1 structure when cut, and Franz's core all comprise 'a continuous ribbon of magnetic sheet material having highest permeability in the direction of its length, wound flatwise upon itself in successive layers,' the core 'being severed transversely at two or more places having the ends of the resulting sections smooth worked,' whereby to permit assembling the core sections around a coil.

"While only Granfield discusses the high permeability in the direction of the length of the core ribbon or strip, it is a characteristic known for many years to be present in rolled magnetic strip, discussed in numerous other patents in this art, as well on the first pages of applicant's specification. Johnson specifies the faces of his cores as 'if necessary planed or machined true.' Granfield cuts 'by a metal saw if desired,' but it is 'better to use a thin abrasive wheel' to cut thru the ring. The faces of the Franz units after cutting are 'machined as by grinding, to provide accurate engaging surfaces to minimize the air gap therebetween when disposed in intimate engagement with each other in assembly.' "

The examiner called attention to the fact that in the Johnson and Franz patents the laminae of the core were held together by means of bushings and rivets.

With reference to the Fessenden and Elmen patents, the examiner said:

"Both of these references also show wound strip cores of the same general type. Both are even closer to applicant's structure than the first three references however, in that the iron laminae here are also secured together in the identical way claimed, namely by adherent bonding. Fessenden names 'paraffin or other suitable cementing material,' whereby the elements of the core sections may be 'cemented into a solid mass.' Elmen specifies 'phenol condensation product' as the material, identical with the 'Bakelite' which applicant names."

Other references were discussed by the examiner, but we deem it unnecessary to discuss them here.

The examiner also held that claims 24 and 25 were unpatentable over claim 21, because the process defined in those claims was "merely the obvious method of making the article" defined in claim 21.

The examiner called attention to a somewhat lengthy affidavit of appellant from which we quote the following:

"When it was discovered in this art about 1916 that the arrangement of grain structure in magnetic material involved less resistance to the flow of magnetic flux in one direction than in other directions, according to the arrangement of the grains, and many years later that material having desired grain orientation for giving high permeability in a selected direction could be produced commercially by a special process of rolling suitable metal into thin strips, and such highly directional material was produced commercially, there resulted an additional incentive to form cores by winding upon itself a continuous strip of material, the strip being so rolled and cut that the path of greatest permeability, that is to say the path of least resistance to the flow of magnetic flux therethrough, would be in the direction of length of the strip."

It appears from the affidavit that before the "preferential directional material was known," it had been proposed to wind up cores from a continuous strip of magnetic material; that in order to secure the desirable interlinking of a wound-up core with a suitable coil, the wound-up core was cut in one or more places so that the coil could be inserted in the severed core; and that, so far as he was aware, none of such cores had been "produced in commercial quantities nor have they been produced with any magnetic material having any substantial preferred orientation or maximum permeability in a definite direction." The affiant further stated that to make a preformed core of material having desired grain orientation for giving high permeability in a selected direction presented great difficulty to those skilled in the art; that the better the magnetic properties of the new material are, the more sensitive the material is under stress; that it was desirable to have the core free from distortion of the material and to avoid air gaps therein; that after the preferred directional magnetic material became available in commercial quantities, appellant's assignee (The Westinghouse Electric & Manufacturing Company) had several of its skilled workers, familiar with transformer engineering, redesign the company's transformer coils; that "Several years of intensive study and experimentation followed, *during which the transformer cores of the Westinghouse Company were completely redesigned at least three times*" (italics ours); that those designs were not adopted because of objections found to exist therein; that "Applicant considered many different ways for providing a commercially satisfactory transformer core from a continuous strip of highly directional metal. He tried many different ways of cutting a coiled-up core to permit its pre-forming and subsequent assembly around a coil, before he found the solution by bonding the *finished annealed core so as to produce in effect a unitary mass that could be accurately machined without changing the relative relations of the layers of the core*" (italics ours); that if the laminated layers were not bonded they would be short-circuited at the cut ends "by burrs formed by the cutting tools"; that when cut, they were spread apart by the cutting action and other defects were found to be present; that after the applicant had worked on the problem for a long period of time and the Westinghouse Company had spent about a half-million dollars in developing a satisfactory transformer core, appellant "conceived the idea of bonding the wound-up coil of core material with an adherent material that would make the core substantially into a unitary mass throughout"; that such treatment produced a core that could be machined as though it were one solid piece of metal; that appellant's device has been commercially successful; and that his alleged invention "has revolutionized the method of manufacture *as used by*

*the Westinghouse Company."* (Italics ours.)

Appellant also referred in his affidavit to many advantages obtained by his new core over the prior art, such as economy of manufacture, and other advantages which need not be set forth here. He then stated:

"The advantages above noted *are largely due to the use of a coiled core of preferred directional material, rather than to my particular way of making such a core. But it is fair, from a practical view point, to attribute these advantages to my particular core and the method of making it."* (Italics ours.)

Appellant further stated that, although he had been familiar with the art for many years and with the products of several companies in the United States and abroad, he knew of "no use of bonding of laminated cores to permit cutting and reassembling in end-abutting relation to reduce air gap losses, as described in this application. That step was arrived at by me only after much study and many unsuccessful experiments."

In its decision, affirming the decision of the Primary Examiner, the Board of Appeals, among other things, said:

"Of the primary references one of the best examples is the patent to Franz. Appellant concedes on page 16 of his brief that the core of Franz was made of a strip of special permalloy steel which has preferred orientation and consequently highest magnetic permeability in the direction of the length of the strip. Applying this reference to claim 22, it appears to be made of a sheet of material wound flatwise upon itself and the layers connected together by bushings 14 to hold them against relative movement. After the coils have been drilled to insert the bushings 14, they are annealed in the Franz process by subjecting them to a suitable temperature and then cooling them. The patentee discloses that subsequent to the casting of the bushings 14, the coil is severed longitudinally at two points indicated at 20 in Fig. 1 by sawing and that the edges of the units are machined in any suitable manner, such as by grinding, to provide accurate engaging surfaces to minimize the air gap therebetween when disposed in intimate engagement with each other in the assembly. The difference of claim 22 over this disclosure appears to reside in the different means used by applicant to bond together the layers of the core.

"The secondary art, as for example, in the patents to Elmen and Fessenden, discloses making coils for the purpose in which the coils are cemented together in Elmen by means of phenol condensation product and in Fessenden by means of paraffin or other suitable cementing material much in the manner of applicant's bonding. The Elmen patent, for example, states that the phenol condensation product is transformed into a hard, infusible and rigid material in which the magnetic material is embedded and is held so securely in place that the permeability will not be changed materially."

The board then held that claim 22 was not patentable over the Franz reference in view of Elmen or Fessenden, and that it would not involve invention to substitute binding material for the bushings in the Franz structure; that claims 21 and 23 were not patentable over the same combination of references; and that claims 24 and 25 were unpatentable over the references of record and were also unpatentable as they defined the obvious method of making the article set out in claim 21.

It is contended here most vigorously by counsel for appellant that, although it may be that all of the elements disclosed in claims 21, 22, and 23 are old in the art, nevertheless, after the discovery of magnetic sheet material having preferred grain orientation in the direction of its length, there was a real problem confronting the art, as stated in appellant's affidavit. Counsel further contend that the affidavit was ignored by both the Primary Examiner and the Board of Appeals, although they admit later in their brief that the board did consider it.

As a matter of fact, it appears from the record that both the Primary Examiner and the Board of Appeals gave consideration to appellant's affidavit.

The Ames reference, referred to by the examiner but not by the board, discloses a magnetic core and a method of making the same. The Ames core is not made of the material used by appellant. However, the patentee discloses the use of pieces of iron or wire or the like, packed into a longitudinal or tubular casing containing *insulating* or other suitable material. The patentee states that, "After the casing has been filled with the magnetic material shellac or other insulating and binding material is forced into the interstices between the pieces of magnetic material" by means of which air

bubbles are carried away and the crevices between the magnetic material are filled with the insulating material. The patentee further states:

"If the core is to be inserted into a magnetic circuit with its ends abutting against opposing faces of the circuit the ends of the core are preferably ground or machined to make them perfectly flat and parallel and to afford good magnetic contacting surfaces."

In the patent to Elmen (issued June 1, 1926) it is stated:

"There has recently been discovered a magnetic alloy comprising nickel and iron, which when properly heat treated has remarkably high permeability at law magnetizing forces of the order employed in electric signaling."

The patentee, Elmen, discloses a circular core made up of strips of highly permeable magnetic material coiled upon itself. The core is wound with paper between its laminae which is burned during the annealing process, and the spaces between the laminae are filled with a bonding material which later solidifies to form a hard rigid mass. The patentee states that the preferred impregnating substance is a phenol condensation product. He described in detail the reason for the use of the insulating material.

It is conceded by counsel for appellant that the magnetic core disclosed in the patent to Granfield (No. 1,992,822) was made by winding a strip of directional magnetic material, and that the core when wound was severed into two semi-circular pieces.

It is true, as stated by counsel for appellant, that the patentee Granfield did not bind the laminae of his core into an integral unit before cutting, as does appellant. However, the patentee shows, without describing, securing the outer free end of the laminated ring by welding or riveting. In the patentee's process, the laminated ring is severed at both sides by means of a thin abrasive wheel to form two sections. The severed ring is then connected to a laminated center leg and a thin layer of insulating material, such as fiber, is placed between each end of each ring section and the center leg to prevent short-circuits between the laminations.

The patent to Franz discloses a method of making electro-magnetic cores. The patentee discloses material similar to that used by appellant. The cores in the patentee's process are made substantially the same as are appellant's, except that, instead of an insulating or binding material being placed between the laminae, the patentee uses bushings to hold the layers of magnetic material against relative movement.

The patent to Fessenden discloses an induction coil and a magnetic core formed by wrapping iron wire "around a suitable former." The patentee states that the "former" around which the wire is wound is boiled in paraffin or other suitable cementing material, and the strands of wire are cemented into a solid mass.

It thus appears that the magnetic material used by appellant was old in the art, and that it was also old in the art to use insulating material between the laminations of a magnetic core, although the references do not disclose the use of an insulating or binding material to bind the laminations of the new magnetic material in the exact manner shown by appellant.

Counsel for appellant rely to a considerable extent on appellant's affidavit, hereinbefore referred to, to sustain their contention that the claims involve patentable subject matter.

Appellant apparently was not as confident of the patentability of the appealed claims at the time of the filing of his affidavit as are his counsel, because, as hereinbefore noted, he stated therein that: "The advantages above noted are largely due to the use of a coiled core of preferred directional material [which he stated was old in the art], rather than to my particular way of making such a core." He further stated, however, that "it is fair, from a practical view point, to attribute these advantages to my particular core and the method of making it."

It would seem to be clear from appellant's affidavit that his knowledge of the prior art was limited to cores which were produced in commercial quantities, and that he was not familiar with all of the prior art patents cited by the tribunals of the Patent Office at the time he was endeavoring to produce the involved core. Had appellant examined those patents, we think he would have had no difficulty in observing that they disclosed, or at least plainly suggested, that by filling the spaces between the successive layers of magnetic sheet material with an adherent bonding material, the layers of magnetic sheet material would be secured against relative movement.

It may be that, from a practical standpoint, appellant's core is better than any of the cores disclosed in the references. However, we are unable to hold, in view of the references of record, that appellant's core, as defined in appealed claims 21 and 22, involves patentable subject matter.

Furthermore, we are of opinion that claim 23, which defines the combination of a magnetic core and a conducting coil, is unpatentable over the references of record and for the reasons stated by the Primary Examiner.

Process claim 24 defines a method of making the core defined in claim 21 and reassembling the severed core sections in end-abutting positions to enclose the coil in the core window and clamping them in that position about the coil. If article claims 21, 22, and 23 are not patentable, and, for reasons hereinbefore stated, we think they are not, it is obvious that claim 24 is not patentable.

Claim 25 defines the obvious method of making the magnetic core defined in claim 21, and as the magnetic core is not patentable over the references of record, we are of opinion that claim 25 is likewise unpatentable.

We have given careful consideration to the arguments presented here by counsel for appellant and to appellant's affidavit of record, but are unable to hold that the tribunals of the Patent Office erred in rejecting the appealed claims.

For the reasons stated, the decision of the Board of Appeals is affirmed.

Affirmed.